

U.S. Bankruptcy Court
District of Idaho
Filed: July 7, 2004
at 9:00 a.m.
By: RB

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| DRILLER, MITCHELL JON | ) | Case No. 04-20083 |
| aka Unusual and Unique, | ) | |
| | ) | |
| | ) | |
| Debtor. | ) | MEMORANDUM OF DECISION |
| | ) | |

## INTRODUCTION

This case raises the question of whether a so-called buyer's premium[1] is an appropriate component of an auctioneer's compensation arrangement when employed to liquidate bankruptcy estate assets. The auctioneer's desire in this

---

[1] A "buyer's premium" is an additional charge assessed against a successful bidder at an auction. "Simply stated, [a buyer's premium] is adding [a] sales commission as an obligation to the buyer after the bid." Leslie H. Miles Jr., *Buyer's Premium*, 18-Oct Am. Bankr. Inst. J., 26 (Oct. 1999) (hereafter "Miles"). By way of example, assume you attend an auction and, becoming enamored of an item, bid $1,000.00 for it. The auctioneer announces the item "sold" for $1,000.00 per your bid (sometimes termed the "hammer price"). If the auction was subject to a buyer's premium of 10%, you would be required to pay the auctioneer $1,100.00 in order to take the item home. Though who gets to keep the premium is subject to negotiation between the consignor/seller and the auctioneer, it is generally retained by the auctioneer. In addition to the premium, the auctioneer may charge the seller a commission and/or require the seller to reimburse certain expenses of sale.

MEMORANDUM OF DECISION - 1



chapter 7 case to add such a premium (of 5%) to its other compensation (an estate-paid commission of 15% and estate reimbursement of all costs of storage, auction set-up, and any out-of-pocket expenses) was disclosed to the Court, though belatedly.[2]

The Court heard and considered the testimony and arguments presented at a hearing on April 13, 2004. It has also considered the objection and briefing of the United States Trustee ("UST") and the *amicus curiae* submissions of the National Auctioneer's Association ("NAA"). To the extent required by applicable rule, this Decision constitutes the Court's findings of fact and conclusions of law on the issues raised in the amended application of the chapter 7 trustee to approve employment of the auctioneer and the UST's objection thereto.

## BACKGROUND AND FACTS

Mitchell Jon Driller ("Debtor") ran a retail establishment by the name of "Unusual & Unique" in Coeur d'Alene, Idaho. Debtor's schedules indicated that on the petition date he held inventory of $32,658.00 and fixtures and equipment of $3,080.00. Doc. No. 1 at schedule B (personal property).

On January 29, 2004, the chapter 7 trustee in this case, Ford Elsaesser ("Trustee"), filed and issued a notice of sale of the business' fixtures, equipment and

---

[2] As discussed below, the original application and supporting statement were silent on the point, but amended pleadings were quickly filed, essentially simultaneously with the Court's entry of an order on the original application. The parties do not rely on that initial order. The Court concludes it need not address, in the present case, the consequences of an auctioneer's charging a buyer's premium but failing to timely disclose that fact in seeking approval of employment by the Court. The UST advises that such issues will be presented in other cases.

MEMORANDUM OF DECISION - 2

inventory. Doc. No. 4. He proposed to liquidate the same through a public auction to occur no less than 30 days and no more than 90 days from the date of the notice. *Id.* Troy Black of Black & Associates ("Black") was identified in Trustee's notice as the proposed auctioneer. *Id.*

On February 13, Trustee filed an application for Court approval of his employment of Black as auctioneer. *See* Doc. No. 6. The proposed terms of Black's compensation were (1) payment by the estate of a "[c]ommission of 15% on the gross amount of money received at sale," and (2) reimbursement by the estate of all "[c]osts of storage, set-up, and any out-of-pocket expenses" Black incurred. *Id.* No identified expenses were to be borne by the auctioneer. *Id.* The application said nothing about any buyer's premium being charged.

Black's verified statement, required under Fed. R. Bankr. P. 2014(a), accompanied the application. *See* Doc. No. 7. It verified the accuracy of Trustee's application, asserted that there were no other connections within the contemplation of that Rule, and alleged Black was disinterested. *Id.* It said nothing about a buyer's premium, nor did it indicate Trustee's application was incomplete.

The Court entered an order approving Black's employment on February 25, 2004, based on the pleadings of record and the lack of timely opposition. *See* Doc. No. 8; *see also* LBR 2014.1. The very next day Trustee filed an amended application for Court approval of his employment of Black. *See* Doc. No. 9 ("Amended Application").

In the Amended Application, Trustee revealed that additional compensation

MEMORANDUM OF DECISION - 3

would be received by Black in the form of a buyer's premium, stating:

> <u>Buyer's Premium</u>: Auctioneer charges the buyer's [sic] a 5% premium. This is not collected for the benefit of the bankruptcy estate and is collected by the auctioneer in addition to his court approved fees and expenses.

*Id.* at ¶ 7. The same day, Black filed an amended verified statement of auctioneer including a similar disclosure. *See* Doc. No. 10 ("Amended Statement").

The UST filed an objection to the Amended Application, arguing that the requested compensation had not been adequately justified, and focusing particularly, though not exclusively, on the buyer's premium. *See* Doc. No. 13. When the Amended Application and the objection came on for hearing on April 13, 2004, the Court approved the parties' stipulation that the sale of the fixtures, equipment and inventory could proceed, reserving questions of Black's compensation including those related to the buyer's premium. The Court allowed time for additional briefing[3] and thereafter took the matter under advisement.

## DISCUSSION AND DISPOSITION

### A.    Approval of trustee's employment of auctioneer

A trustee's employment of an auctioneer must be approved by the Court pursuant to § 327(a), which provides:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants,

---

[3] The UST decided to rely on its pre-hearing briefing without any post-hearing supplementation, and Trustee declined to file any briefing at all. The parties did stipulate that the record could be supplemented by affidavits and briefing from the NAA. *See generally* Doc. No. 24, Doc. Nos. 26 - 31. The NAA submitted an affidavit, Doc. No. 28, and a brief, Doc. No. 29, which have been considered.

MEMORANDUM OF DECISION - 4

appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

§ 327(a). The Code's requirements in § 327(a) are effectuated by Fed. R. Bankr. P. 2014(a). *In re Larson*, 04.1 I.B.C.R. 20, 23, 2004 WL 307182 (Bankr. D. Idaho 2004).

Rule 2014(a) requires among other things that a trustee's application for approval of employment "state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, *any proposed arrangement for compensation*, and, to the best of the applicant's knowledge, *all of the person's connections with the debtor, creditors, and any other party in interest* . . . ." Fed. R. Bankr. P. 2014(a) (emphasis supplied). *See also* LBR 2014.1(a). Rule 2014(a) further requires a "verified statement" from the proposed professional, setting forth all that person's connections with the indicated parties and entities. This statement "is designed to produce disclosure of all relevant information about the connections and relationships between the professional and the [trustee]." *Larson*, 04.1 I.B.C.R. at 23.

The fact that the auctioneer is to receive payment from a third party, the buyer, as well as from the estate is undeniably relevant information. The anticipated use of a buyer's premium, and the details regarding that premium, must therefore be disclosed. *See generally* 9 Collier on Bankruptcy § 2014.02 at 2014-4

MEMORANDUM OF DECISION - 5

(Alan N. Resnick & Henry J. Sommer eds., rev. 15th ed. 2000) (stating that "[a]ny compensation arrangements which have been made with the professional must be described in the application. This is so regardless of whether the compensation will involve payment by the estate.").

**B.      Approval of auctioneer's compensation**

Court approved professionals may be allowed "reasonable compensation for actual, necessary services . . . and reimbursement for actual, necessary expenses" upon compliance with § 330 and § 331. Generally speaking, compensation is not a matter taken up at the time of approval of employment under § 327, even though it is quite clear the "proposed arrangement for compensation" must be disclosed as required by the express terms of Rule 2014(a). *See generally In re Dearborn Constr., Inc.*, 03.1 I.B.C.R. 17, 22, 2002 WL 31941458 (Bankr. D. Idaho 2003) (discussing disclosure requirements).

But, as the UST correctly observes, Fed. R. Bankr. P. 6005 requires that "[t]he order of the court approving the employment of an appraiser or auctioneer shall fix the amount or rate of compensation." This special provision applicable to auctioneers and appraisers obviously makes the disclosure requirements of Rule 2014(a) critically important, including, as noted, disclosure of the use of a buyer's premium. *See generally* 9 Collier on Bankruptcy § 2014.02 at 2014-4 (quoted above); *see also In re Remote Operating Sys., Inc.*, 238 B.R. 656, 658 (Bankr. N.D. Tex. 1999) (noting that if a buyer's premium is to be charged, the trustee's application to employ the auctioneer has to seek specific authorization from the

MEMORANDUM OF DECISION - 6

court); *Priddy v. First Nat'l Bank of Arvada (In re Rossmiller)*, 148 B.R. 326 (D. Colo. 1992) (finding that disclosure of a buyer's premium was required and failure to do so supported sanctions); *In re Maropa Marine Sales Serv. & Storage, Inc.*, 92 B.R. 547, 548 (Bankr. S.D. Fla. 1988) (requiring disclosure of use of buyer's premium). The NAA, in its briefing, unequivocally recognizes that if the total compensation to be charged includes a buyer's premium, it must be disclosed to the Court in the trustee's application to employ the auctioneer. See Doc. No. 29 at 2.

For this reason, and apparently being sensitive to the issue given other cases being readied for litigation, Trustee and Black submitted the Amended Application and the Amended Statement disclosing the anticipated use of the 5% buyer's premium.

The Court is therefore asked, as it is in all cases of employment approval of auctioneers and appraisers, to determine the reasonable compensation for the professional before, rather than after, the services are performed. Determining reasonableness requires analysis of compensation practices for professional persons performing comparable services in nonbankruptcy forums. *In re Nucorp Energy, Inc.*, 764 F.2d 655, 658 (9th Cir. 1985); *see also Remote Operating Sys.*, 238 B.R. at 658. Therefore, standards and practices in nonbankruptcy auctions are relevant. So, too, is evidence of what similar professionals would charge a trustee in other bankruptcy cases.

MEMORANDUM OF DECISION - 7

C. **Buyer's premiums in auctions**

1. **Development and use of buyer's premiums, and their relation to overall compensation**

The NAA indicates that buyer's premiums have become an accepted part of the American auction landscape. Based on a market study in which the NAA received almost 700 survey responses from auctioneers, it submits that, nationally, 77% of auctioneers use a buyer's premium.[4] The NAA asserts that 40% use it with every auction, and 20% use it frequently. However, 17% use a buyer's premium only occasionally, and 23% never use it. See Doc. No. 28.

That such premiums have become more common does not make them indispensable, or even a particularly good idea. There is a fair amount of debate over the subject, even among those in the auction industry.

There are those that see the buyer's premium as a "gimmick" or worse.[5] Certainly, no trustee should allow an estate-employed auctioneer to use such a premium without full and fair disclosure of the existence of the buyer's premium to prospective purchasers. Such candor is not only appropriate, it might mitigate some of the criticism leveled at the practice. But there are other issues as well. One is

---

[4] The NAA estimates that there are approximately 24,367 auction companies in the United States and submits that its market sampling and survey methodology should provide a 95% confidence level in the reported results. See Doc. No. 28.

[5] Miles at 26 ("One might consider a buyer's premium somewhat of a gimmick, and in some ways, it is."); Deb Weidenhamer, *Buyer's Premium: To Charge or Not to Charge*, Auction World, http://www.auctionandappraise.com/ARTICLES/BPTOCHARGE.HTM (last visited July 1, 2004) (hereafter "Weidenhamer") ("Buyers' feelings about buyer's premiums range from simple annoyance at having to constantly subtract the premium from their bid amounts; to rage at having been tricked into paying too much by the use of a 'gimmick'.").

MEMORANDUM OF DECISION - 8

whether the seller is advantaged or disadvantaged by the practice.

Here, the Amended Application and Amended Statement take pains to indicate that the premium is not collected for the benefit of the bankruptcy estate. It is also argued, at least implicitly, that the estate does not suffer from the presence of the premium since it is paid directly by the buyer, not the estate.[6] Others, however, see the premium as a charge ultimately borne by the seller:

> Educated sellers almost universally dislike buyer's premiums. They feel, and accurately so, that the buyer's premium is primarily coming out of their own pocket. . . . The more experienced the auction seller, the more negative their opinion of buyer's premiums. The only sellers that seem to like the buyer's premiums are those that have been erroneously convinced that the premium is not costing them anything.

Weidenhamer at *2. How can a premium charged to and paid by the buyer cost the seller? In essence, the idea is that "[w]hen buyers reduce their bid prices to compensate for buyer's premiums, the seller's revenue is negatively impacted[.]" Id.[7]

---

[6] Many buyers are hard pressed to see this as a "premium" in the commonly understood sense of a benefit they receive. To them, it is really more of a "buyer's surcharge" which they must pay in addition to the amount of their successful bid. Of course, the term "premium" can refer to something other than a reward or benefit. An alternative definition of premium is an extra charge, such as an amount that must be paid to obtain a loan, or stock, or an amount paid for an insurance policy. See generally Webster's New Twentieth Century Dictionary 1420 (2d ed. 1983). Semantics aside, the use of the term "buyer's premium" appears to be firmly entrenched in the auction arena, as are the objections of some to the term as inherently misleading.

[7] Weidenhamer notes another drawback: in her home state "bidders will often choose between two auctions on the basis of which auction does not charge a buyer's premium." Id at *1. If the presence of a buyer's premium chases away prospective bidders, it is logical to assume revenues are impacted. Auctions work best when they are well, rather than sparsely, attended.

MEMORANDUM OF DECISION - 9

The impact of the premium is admittedly difficult to discern[8] and may differ depending on the particular facts and circumstances of a given auction. Some possible scenarios, however, help illustrate the nature of the debate.

Assume an auction with a 15% seller's commission and no buyer's premium. If bidders at that auction collectively bid $100,000.00 for the goods sold, the auctioneer retains $15,000.00 of the proceeds and pays $85,000.00 to the seller.

Now assume that the same goods are sold at an auction with a 15% seller's commission and a 5% buyer's premium. If bidders are oblivious to the effect of the buyer's premium on what they ultimately will pay, the goods will still sell for $100,000.00. The seller still receives $85,000.00 ($100,000.00 less the 15% commission). The auctioneer, however, will receive compensation of $20,000.00 (the $15,000.00 commission plus the $5,000.00 buyer's premium).[9]

---

[8] The NAA contends that "imposition of a buyers' premium which is less than or equal to ten percent (10%) of the successful bid has little or no effect on the outcome of the auction." See Doc. No. 29 at 5; see also Miles at 26 (using the same statistics). The empirical basis for this assertion is not clear.

[9] A couple of caveats are necessary. First, an auction compensation structure is subject to negotiation. The example here assumes that the auctioneer does not agree to share the buyer's premium in whole or part with the seller, but instead desires to retain it as "additional" compensation. This appears to be the general approach, and certainly appears to be the intent of Black. Second, the example assumes that the "gross" sale revenue, upon which the commission is then calculated, excludes the premium. That, too, may be the understanding of Trustee and Black, who indicate that "the premium is not collected for the benefit of the bankruptcy estate" (though they also state that the commission will be "15% on the *gross amount of money received at sale*" without any clear exclusion of the premium. See Doc. Nos. 9, 10. If the premium were included in the calculations, the gross sales revenue would be $105,000.00, and a 15% commission based on that figure would be $15,750.00. If the auctioneer kept the premium ($5,000.00) and the commission ($15,750.00), it collects $20,750.00 and the seller would receive $84,250.00 ($105,000.00 minus $5,000.00 minus $15,750.00).

MEMORANDUM OF DECISION - 10

Next assume that the same auction is attended by reasonably informed and alert bidders who are aware that a 5% premium is going to be assessed on any successful bid. Many, perhaps most, will in turn lower the amounts they are willing to bid for the goods.[10] If they collectively reduce the amounts they are willing to pay by the extent of the anticipated buyer's premium, the goods will sell for approximately $95,000.00.[11] The seller would then receive $80,750.00 ($95,000.00 less 15% or $14,250.00). The auctioneer will receive $19,000.00 consisting of $14,250.00 from the 15% commission and $4,750.00 as a 5% buyer's premium collected on $95,000.00 in bids.

When the first scenario (a 15% commission and no buyer's premium) is compared with the last scenario, the seller receives $4,250.00 less when a buyer's premium is charged ($85,000.00 vs. $80,750.00). Although the estate receives lower total returns, the auctioneer is still motivated to use the buyer's premium because his compensation increases from $15,000 to $19,000. It thus appears that the auctioneer's $4,000 increase in compensation comes at the seller's expense and it is the seller, not the buyer, who "pays" the buyer's premium.

The UST argued that a buyer's premium would have such a chilling effect on

---

[10] Miles asserts that it is difficult to use buyer's premiums "in liquidations using sealed bids or orderly negotiations as the buyers have time to adjust the premiums out of their offers" and that a buyer's reduction in bid amounts to account for the eventual premium "is less likely to occur in open competitive bidding, with its inherent faster pace." Miles at 27.

[11] It is, of course, unlikely that even such prescient bidders would reduce their bids with mathematical precision. Buyers might reduce their bids by more or less than the buyer's premium.

MEMORANDUM OF DECISION - 11

the amounts bid, or other negative impact on the auction process. Certainly some critics of the practice believe this is true. However, no evidence on this point was presented to the Court by the UST.

Logic dictates that a buyer's premium, if sufficiently regular or common in an area, may not chase away buyers totally, as they would have no alternative auction to attend.[12] But logic would also dictate that, as buyers become aware of the use of the practice, they will take it into account and adjust their bidding accordingly. This could impact the overall revenue generated for the estate at the sale. Whether it will impact the net amount received by the bankruptcy estate as seller depends on the degree of adjusted bidding, and also on the nature of the overall compensation package negotiated with the auctioneer. But certainly the existence of a buyer's premium is an important factor that must be disclosed in connection with the sale, and its presence must be considered in determining the auctioneer's reasonable compensation.

### 2. Uses of buyer's premiums in local auctions

Of course, this discussion of the increasing use of buyer's premiums nationally does not directly address what an Idaho trustee can or should expect when attempting to find competent and reasonably priced auctioneer services.[13]

---

[12] *Cf.* Weidenhamer, *supra* note 7.

[13] It must also be noted that what might be true in one part of this District would not necessarily hold in other areas. Buyer's premiums have appeared in some (but certainly not all) bankruptcy cases in northern Idaho and, to some degree, in the Boise area, but apparently not to any significant degree in the central or eastern parts of the State. Whether
(continued...)

MEMORANDUM OF DECISION - 12

Here, Trustee testified regarding his experience as a liquidating trustee in bankruptcy cases over several years in the northern Idaho and eastern Washington area. This testimony included the results of his inquiries into auctioneer compensation structures generally and what alternatives would be made available to him as he liquidated bankruptcy estate assets.

Trustee indicated that the amounts of both the seller's commissions and the buyer's premiums were negotiable and, to some degree, were dependent on the size of the overall auction or at least the amount of goods the seller contributed to the auction. In many cases, lower seller's commissions appeared to be offset by higher buyer's premiums. More specifically, commissions ranged from 10% to 30%, and buyer's premiums ranged from none at all to 10%. In some cases, higher seller's commissions (such as 25% or 30%) would have either no or relatively small buyer's premiums (e.g., 5% or less). Conversely, lower seller's commissions (such as 10% or 15%) would often be accompanied by 10% buyer's premiums. In this milieu, Black's suggested 15% seller's commission and 5% buyer's premium is not clearly objectionable. It certainly is not outside the range of compensation formulae used in the local area generally.[14] In fact, the UST ultimately

---

[13](...continued)
this reflects differences in the general business practices of auctioneers or a response to how their auction attendees react to premiums in different geographical areas, or results from the practices, demands or negotiations by different bankruptcy trustees, is not clear.

[14] The evidence further supported the idea that most auctioneers expected that some or all of their expenses would be reimbursed from the proceeds of sale. Such reimbursement clearly was the expectation under the Amended Application here. The
(continued...)

MEMORANDUM OF DECISION - 13

acknowledged that use of a buyer's premium "has become a common feature of local area auctions in non-bankruptcy cases." Doc. No. 21.

### 3. Bankruptcy trustees as frequent sellers

The evidence thus supports Trustee's Amended Application. But, in many ways, it was not particularly compelling support for the suggested compensation structure. Bankruptcy trustees provide a ready source of goods for sale at auction. One could reasonably assume that bankruptcy trustees are in a strong negotiating position with auctioneers and could obtain adjustments in commissions or reductions in reimbursable expenses in return for a steady flow of property to sell. After all, bankruptcy filings in this District, as nationally, have steadily increased, and there is no basis to assume the growth will abate. That the compensation structure under the present application represents the results of such negotiation was not entirely clear.

### 4. Expecting results commensurate with compensation

The estate should receive appropriate benefit for the compensation paid. Payment of seller's commissions and buyer's premiums, particularly from the middle to the top of their respective ranges in the local market, plus reimbursement of virtually all identifiable expenses, should be reserved for those situations where it can be shown that the auctioneer's methods and practices result in equally exceptional performance, *i.e.*, auction attendance and revenues. Enhanced net

---

[14](...continued)
question of expenses is considered separately, *infra*.

MEMORANDUM OF DECISION - 14

revenue is a fair expectation if "premium" compensation packages are paid. Otherwise the seller (here the bankruptcy trustee on behalf of the creditors of the estate) might be better off hiring a different auctioneer. Certainly, if additional proceeds are not received sufficient to cover the increased compensation agreed to be paid, the net to the seller could be less than competing auctioneers might provide. "The seller should always look toward the highest net result, rather than the largest gross liquidation number." Miles at 27.[15]

### D. Application to the present case

In summary, the evidence indicates that Black's use of a 5% buyer's premium is not outside the range of accepted practices for auctioneers in the northern Idaho area in nonbankruptcy situations. While the Court has several concerns, as indicated above, it must also concede that the record contains no clear, probative evidence that better alternatives are reasonably available to Trustee at this time, and the UST did not effectively impeach or contradict the testimony of Trustee on this point.

The question is therefore whether the 15% seller's commission and 5% buyer's premium, considered in tandem, amount in this case to reasonable

---

[15] The Court appreciates that hard empirical data is difficult to obtain. After all, the same good cannot be sold simultaneously by different auctioneers in order to compare performance, and there are differences even if a trustee were to consign similar types of goods to two different auctioneers. But the Court also knows that the District's panel trustees are talented and experienced individuals, and believes they can cogently and rationally evaluate whether the results being obtained by their selected auctioneer is appropriate whether measured against the compensation paid or measured against that auctioneer's competition.

MEMORANDUM OF DECISION - 15

compensation. The UST objects to what it characterizes as an effective 19-20% commission, and argues that this Court has historically not approved an auctioneer's commission in excess of 15% absent unusual circumstances.

While that may well be true, here Trustee testified that the total compensation, including buyer's premium, was reasonable, and identified several higher compensation schemes by other auctioneers in the local area. Apparently his ability to negotiate a 15% commission *sans* buyer's premium no longer exists. Trustee also testified that he could not secure and store estate assets and conduct his own auction with any greater return to the estate.[16] Consequently, he argued that Black's employment was reasonable and would bring substantial value to the estate. The UST raised legitimate questions, but presented no competing evidence. Thus, the Court finds sufficient support for Black's commission and premium structure in this case.

This, in many ways, resolves the question presented by the Amended Application, and the UST's objection, at least in regard to the assets of Unusual & Unique. However, the result reached on the evidence here would not necessarily control similar issues in cases elsewhere in the District. Indeed, it might not even be particularly persuasive in other cases in the same geographic region should it be shown that other alternatives are or have become available. It appears inescapable

---

[16] Some trustees have collected and stored estate assets and held their own "bankruptcy auctions," eliminating auctioneer compensation even if not eliminating all sale related expenses. Here, Trustee testified that this is not a workable alternative given his caseload and the make-up of those cases, and he was not examined by the UST about these assertions.

MEMORANDUM OF DECISION - 16

that business practices in the auction yards are continuing to change and develop. While changes in the recent past have included a greater use of buyer's premiums, there may be countervailing pressures on the industry, as potential buyers make their feelings about the buyer's premium known to the market, or other auctioneers seek a competitive advantage.

### E. Reimbursement of expenses

As noted, the Amended Application and Trustee's notice of sale indicate that no expenses related to the auction are to be paid by the auctioneer, and that the estate will pay, apparently through deduction from sales' proceeds, all costs of storage, set-up, and any out-of-pocket expenses Black incurs.

The UST objects to this aspect of the Amended Application, arguing that normal overhead expenses of estate compensated professionals are not reimbursable under § 330(a)(1)(B), which allows for payment of "actual, necessary expenses." It contends that, under *Sousa v. Miguel (In re United States Trustee)*, 32 F.3d 1370 (9th Cir. 1994), overhead expenses such as "rent, insurance, taxes, utilities, secretarial and clerical pay, library, computer costs, office supplies, local telephone charges, meals, and local travel" are not reimbursable. *Id.* at 1375. Further, the UST contends that, specifically in regard to auctioneers, "labor, secretarial work and visits to premises" are included in overhead. *See* Doc. No. 21 at 3 (citing *In re Schwemmer Hardware Co.*, 103 B.R. 635, 641 (Bankr. E.D. Pa. 1989), and *In re Cal Farm Supply Co.*, 110 B.R. 461 (Bankr. E.D. Cal. 1989)).

Trustee provided no briefing or citations on the question of expenses. The

MEMORANDUM OF DECISION - 17

Court's review of authorities leads it to conclude that the UST is correct in arguing that § 330(a) does not allow for reimbursement of normal overhead expenses. *Sousa*, 32 F.3d at 1375.[17] "Nonreimbursable overhead has been defined as regular administrative and general expenses incident to the operation of a business that cannot be attributed to a particular client or cost." 3 Collier on Bankruptcy § 330.05[a] at 330-65 (citing *In re Convent Guardian Corp.*, 103 B.R. 937 (Bankr. N.D. Ill. 1989)).

The Court may only allow reimbursement of actual, necessary expenses specific to and benefitting this estate. To the extent the "costs of storage, set-up and any out-of-pocket expenses" requested in the Amended Application are specific to and benefit this estate, and are fully documented, they will be allowed by the Court, but there can be no reimbursement of overhead expenses. While the Court must approve the auctioneer's compensation structure prior to employment pursuant to Fed. R. Bankr. P. 6005, the auctioneer is still required to file a request for compensation including an itemization of expenses and to serve the same pursuant

---

[17] The *Sousa* court clarified that reimbursable expenses needed to be "associated with the *special needs* of an individual case and [be] *fully documented*," giving the following example regarding a trustee's overhead expenses:

> postage to give 100 creditors notice of a proposed sale is reimbursable, but an allocation of general postage costs is not; the costs of a special clerk hired to collect an estate's accounts receivable are reimbursable, but a general allocation of the salary of the trustee's employees is not; the charge for a specific telephone conference call is reimbursable, but an allocation of the basic monthly telephone charge is not; preparation of a special flyer to advertise a sale is reimbursable, but the cost of the trustee's letterhead is not.

*Sousa*, 32 F.3d at 1374 (quoting *In re Williams*, 102 B.R. 197, 198 (Bankr. N.D. Cal. 1989)).

MEMORANDUM OF DECISION - 18

to Fed. R. Bankr. P. 2002(a) prior to being entitled to payment. Specific objections to the itemized expenses may be raised by the UST or other parties at that time. *See Cal Farm*, 110 B.R. at 465-66 (noting that auctioneer's compensation may only be modified after approval of employment based on "unanticipated developments," but expenses are not subject to such a standard and may be reviewed by the Court when presented in itemized form after completion of the sale).

## CONCLUSION

For the reasons indicated, the UST's objection will be overruled, and Trustee's Amended Application, Doc. No. 9, will be approved by the Court. Trustee may submit an appropriate order.

DATED this 7th day of July, 2004.

TERRY L. MYERS
CHIEF U.S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 19

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I served by the method indicated below, a true copy of the document to which this certificate is attached, to the following named person(s) at the following address(es), on the date shown below:

DATED: July 7, 2004

Case No. 04-20083 (Mitchell J. Driller)

Office of the U.S. Trustee
304 N. 8th Street, Room 347
Boise, ID 83702
jeff.g.howe@usdoj.gov
gary.mcclendon@usdoj.gov
    ☐ U.S. Mail    ☐ Facsimile    ✓ Email

J. Ford Elsaesser
P.O. Box 2220
Sandpoint, ID 83864
pts1@ejame.com
    ☐ U.S. Mail    ☐ Facsimile    ✓ Email

Joseph M. Meier
Cosho Humphrey Greener & Welsh, PA
815 W. Washington
Boise, ID 83702-5590
jmeier@chgw.com

    ☐ U.S. Mail    ☐ Facsimile    ✓ Email

_____
Ronda Buck
Judicial Assistant to Judge Myers

> Note to Email service: A PDF version of the above decision/order was electronically transmitted to the parties indicated above. Email service is provided as a courtesy only upon request of a party. To review an electronic image of the original of this document, or to subscribe for email service of future decisions/orders from the Bankruptcy Judge, please access the Court's Internet web site, www.id.uscourts.gov.

MEMORANDUM OF DECISION - 20